**ST. LOUIS SOUTHWESTERN RY. CO. v. FERGUSON.**

No. 13936.

United States Court of Appeals
Eighth Circuit.

June 23, 1950.

Rehearing Denied Aug. 4, 1950.

950

Wayne Ely, St. Louis, Mo. (John W. Murphy, St. Louis, Mo., with him on the brief), for appellant.

Paul R. Brown, Chicago, Ill. (Jerome F. Duggan and Carl M. Dubinsky, St. Louis, Mo., with him on the brief), for appellee.

Before JOHNSEN and COLLET, Circuit Judges, and HARPER, District Judge.

JOHNSEN, Circuit Judge.

Ferguson, a switchman, recovered a verdict and judgment against his employer, St. Louis Southwestern Railway Co., for injuries resulting from a violation of a provision of the Safety Appliance Act of March 2, 1893, 27 Stat. 531, 45 U.S.C.A. § 2. He claimed to have been injured because a coupler on a freight car, after being duly set, had failed to couple automatically on impact.

45 U.S.C.A. § 2 provides that "It shall be unlawful for any common carrier engaged in interstate commerce by railroad to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

The principal contention here is that the evidence was insufficient to establish a violation of the Act. The case was tried prior to the recent opinions of the Supreme Court in O'Donnell v. Elgin, Joliet & Eastern Ry. Co., 338 U.S. 384, 70 S.Ct. 200, 94 L. Ed. ——, Carter v. Atlanta & St. Andrews Bay Ry. Co., 338 U.S. 430, 70 S.Ct. 226, 94 L.Ed. ——, and Affolder v. New York, Chicago & St. L. R. Co., 339 U.S. 96, 70 S.Ct. 509, 94 L.Ed. ——.

The accident occurred at night in the Company's yards at Pine Bluff, Arkansas. A freight train was being made up by shunting a number of strings of cars together on a side track. It was plaintiff's duty to see that the various strings properly coupled with each other. The first string had consisted of 38 cars. Plaintiff testified that before the second string was sent in he looked at the end car of the first string and with the aid of his lantern assured himself that the knuckle of its coupler was open. This was a Western Fruit Express refrigerator car. He further said that as the second string came rolling in, at a speed of 2 to 3 miles per hour, he similarly made observation of its lead car and saw that its coupler also was open. This was an Illinois Central car. That the coupler on this car was open was corroborated by another member of the switching crew, who testified that he had

properly set it before the string was shunted up the track. It was agreed that all that normally was supposed to be done to make two cars couple on impact was to have the knuckle on either of them, or on both of them, sufficiently open when the cars came together.

According to plaintiff's testimony, when the IC car came in contact with the WFE car, their couplers failed to "make" but instead the knuckle of each "butted" or closed. The impact caused the slack in the first string of cars to be taken up, so that the IC car and the WFE car were left standing several feet apart. Plaintiff thereupon undertook to reopen the knuckle on the IC car, by lifting the lever on the end of the car which was intended to make this operation possible without going between the rails. The lever however would not "jiggle" the knuckle open, and so he stepped into the space between the ends of the two cars and opened the knuckle manually. He claimed that while he was so doing he noticed that the drawbar or shank of the coupler was out of line, and he thereupon pulled it back an inch and a half or more to straighten its position. Just as he finished doing this, a third string of cars was shunted against the second, causing the latter to be impacted once more against the first and resulting in plaintiff being knocked down and run over by the IC car.

The evidence for defendant showed that on this impact the IC car and the WFE car duly coupled, and this fact was not disputed. A switchman who checked the mechanical action of the couplers after the accident testified that all the parts appeared to be working properly at that time. No repairs had been made or been necessary on either coupler since its installation. Both couplers remained continuously in service after the accident, including their going out immediately on the freight train which had been in process of assembly at the time.

There further was testimony by experts that it was impossible for the drawbar or shank on the IC car to have been out of line, as plaintiff claimed, since the coupler had an automatic gravity centering device, and that, even if a misalignment of $1\frac{1}{2}$ inches had been present, this would not have

been capable of keeping the knuckles on the two cars from engaging and coupling.

■ On this and other evidence of comparable significance in its relation to plaintiff's proof, defendant sought to have the trial court rule as a matter of law that there had been no violation of the Act. But under the O'Donnell, Carter and Affolder opinions, as well as the previous decisions of the Supreme Court read in their light, a court may not declare that there has been no violation of the Act, so as to take a case from the jury, where there is substantial evidence, by direct testimony or on probative circumstances, that on the occasion of the accident the coupler had been duly opened but failed to couple automatically upon impact—no matter how absolute is shown to have been the care of the railroad generally or how perfect the performance of the coupler otherwise. In such a situation, it is for the jury to say whether the things which plaintiff's proof shows as occurring constitute the facts; and the railroad's care and diligence, as well as the previous and subsequent working of the coupler, will only have relevancy as they may assist the jury in determining the facts of the accident. If the jury adopts plaintiff's view of the facts, that the coupler upon the specific occasion had been duly opened but failed to couple automatically on impact, then a violation of the Act has been established, and a liability exists provided the violation also is shown to have borne a causal relationship to the injury.

■ And as to causal relationship, the court in such a case equally has no right to direct a verdict on legalistic refinements between remote and immediate causation. Cf. Carter v. Atlanta & St. Andrews Bay Ry. Co., supra, 338 U.S. 430, 70 S.Ct. at pages 228 and 229. The Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., which is the vehicle of suit for injury from a violation of a Safety Appliance Act, gives the employee a recovery right, even though the violation has been only "in part" responsible for the injury. 45 U.S.C.A. § 51. The causal question therefore too must be allowed to go to the jury in every case where there is probative evidence from which it would be rationally possible for any one to be persuaded that the violation has been "a contributory proximate cause" of the injury. Coray v. Southern Pacific R. Co., 335 U.S. 520, 523, 69 S.Ct. 275, 277, 93 L.Ed. 208. The choice between the conflicting theories of causation, each of which is a rational possibility on some probative fact or facts, is one which the jury alone is entitled to make. Ellis v. Union Pacific R. Co., 329 U.S. 649, 653, 67 S. Ct. 598, 600, 91 L.Ed. 572.

■ In this connection, it further is to be kept in mind that, since under the proviso in 45 U.S.C.A. § 53 no such thing as contributory negligence will be recognized "where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee," any proof of negligence on the part of an injured employee in a suit predicated on a violation of a Safety Appliance Act is pertinent only to a contention by the defendant that such negligence was the sole efficient cause of the accident and that if in fact there was any violation of the Act such violation could not possibly have been a causative factor in making the injury occur. See Grand Trunk Western R. Co. v. Lindsay, 233 U.S. 42, 34 S.Ct. 581, 58 L.Ed. 838, Ann.Cas.1914C, 168; Johnson v. Great Northern R. Co., 8 Cir., 178 F. 643, 102 C.C.A. 89.

■■ Again, since the Act here involved is violated on any occasion that a coupler fails to couple automatically on impact when it has been duly opened, whether or not a specific defect exists in any of the parts, an injured employee is not required to theorize in his complaint upon why the coupler at the time of the accident failed to function in the prescribed manner, nor is he bound to substantiate any theory of specific defect which he may have presumed thus to set out. The fact therefore that plaintiff here had alleged and offered testimony that the drawbar upon the IC car was out of line did not, as defendant argues, limit his right to go to the jury generally upon the questions of violation and proximate cause. The advancing by a plaintiff in a coupler case of a theory of specific defect and his attempt to

prove such a particular condition are without any legal effect, such as is the situation under the rule applied generally in negligence cases of res ipsa loquitur. Such pleading and proof are in a coupler case no more than trial tactics, which seek to use concrete explanation as a force of persuasion upon the general questions of violation and proximate cause.

The foregoing principles on proximate cause, contributory negligence and pleading and proof of specific defect are well settled, and we should not feel warranted in restating them here, except that they embrace and answer additional contentions which appellant has made, beyond the question of violation, on why it was entitled to have had its motion for a directed verdict sustained. On the principles set out, the trial court properly denied the motion on all of its grounds.

█ Another contention urged for reversal is that the court should have sustained appellant's motion for a mistrial based upon a remark of plaintiff's counsel across the table to defendant's attorney, after the adjournment of trial for the day and while some of the jurors were in the process of leaving the room. The remark made was: "Now you can go to hell with your offer of settlement. This man (appellant's last witness before the adjournment) made my case for me."

A juror identified in the record as No. 7 was passing the end of the table at the time and two others were following him. Appellant conceded that the remark was inadvertent and without any thought on the part of plaintiff's attorney that some juror might hear it. Associate counsel for appellant heard the remark made but associate counsel for plaintiff did not, although both were standing at the table behind the two respective trial attorneys.

Upon appellant's immediate motion for a mistrial in the judge's chambers, the court suggested that the jury be interrogated the next morning to ascertain if any of them had in fact heard the remark. Counsel for appellant was permitted to suggest the form of the questions which he thought should be asked. When the jury returned, the court explained that a remark had been made between counsel the previous evening as some of the jury were leaving the court room, which had been inadvertent but which some of them might have overheard. He then said, "I am asking each of you jurors to tell me whether you heard any remark between counsel * * * as you were leaving the court room or the jury box last night." Turning to juror No. 7, he added, "I understand that you were the nearest man there, so if anyone heard it, you probably did." Pressing the matter as to the entire jury, he directly asked, "Did any juror hear any remark between counsel as you were going out of here?" which question he followed with the exhortation, "It is important." Two jurors immediately volunteered that they had heard nothing. Juror No. 7 likewise responded, "All I noticed is two lawyers were talking as I went by but I didn't hear what they said." In a final precaution, the court rechanneled the inquiry to juror No. 7, and said, "My information is that if anyone did hear it, you were the closest to them." Again the juror replied, "I don't even know whether they were discussing the case or not; I just know that they were talking, but I don't know what they said." No further interrogation was requested or suggested by appellant, and the court ordered the trial resumed.

Plainly, the court had conscientiously endeavored to probe the situation and to ascertain whether any juror had heard the challenged remark, and he was satisfied from his inquiry that none had. There thus was no reason for him in the interest of justice to declare a mistrial and to nullify the long and expensive trial proceedings. The interrogation made was comprehensive and penetrative, with an opportunity to observe the jury and to evaluate its attitude of apparent frankness and honesty. The record affords no basis for us to impugn the jury's integrity and to declare erroneous the trial court's appraisal, by an abstract holding that we think it probable that some juror must have heard the inadvertent remark. Cf. Greenacre v. Filby, 276 Ill. 294, 114 N.E. 536, 539, L.R.A.1918A, 234.

█ It is further contended that a mistrial also should have been granted for re-

marks made by plaintiff's counsel in his argument to the jury. The remarks were answered by counsel for appellant, and no objection for impropriety was interposed until after the jury had been finally instructed and had retired to deliberate on its verdict. Then appellant, as a seeming afterthought, moved for a mistrial. The objection came too late to entitle appellant to have the propriety of the remarks passed upon as a matter of right. London Guarantee & Accident Co. v. Woelfle, 8 Cir., 83 F.2d 325, 344; Thomson v. Boles, 8 Cir., 123 F.2d 487, 495; Chicago & N. W. Ry. Co. v. Green, 8 Cir., 164 F.2d 55, 64. While we still in such a situation, despite the lack of timely objection, would be privileged to set aside a judgment resting upon an abuse of jury argument, we have consistently refused to do so except "under the most unusual circumstances" and in the interest of judicial administration itself. And in the present instance, if the argument could be claimed to have gone beyond proper bounds in any particular, the situation was at most one where a word of caution or an instruction to disregard, seasonably requested and given, would have been sufficient, and not one where even at the time a mistrial would have been required to be declared.

Error has been alleged in the giving and refusing of various instructions, but our examination of the instructions shows no such merit in these contentions as would warrant a reversal.

█ The final contention is that the verdict is so grossly excessive as evidently to have been the result of sympathy, passion and prejudice. We have said many times that the excessiveness or inadequacy of a verdict is not a question for our consideration, but that the entreaty for any such vice lies solely to the judgment and the conscience of the trial judge on motion for a new trial. This is because the amount of a verdict is primarily a factual evaluation on inabsolute elements, while our function traditionally has been regarded as extending only to a testing of the soundness of the processes by which such a result has been achieved.

Typical of our expression upon the question are the opinions in Public Utilities Corporation of Arkansas v. McNaughton, 8 Cir., 39 F.2d 7, 8, 9; Chicago & N. W. Ry. Co. v. Kelly, 8 Cir., 74 F.2d 31, 37; Kurn v. Stanfield, 8 Cir., 111 F.2d 469, 474; Peitzman v. City of Illmo, 8 Cir., 141 F.2d 956, 963; and Chicago & N. W. Ry. Co. v. Green, 8 Cir., 164 F.2d 55, 64. The same rule has been adhered to generally in the other Circuits. (See discussion of Judge Learned Hand in Miller v. Maryland Casualty Co., 2 Cir., 40 F.2d 463, 464, 465.)

The rule accords also with the expressions of the Supreme Court in Fairmount Glass Works v. Cub Fork Coal Co., 287 U.S. 474, 481, 485, 53 S.Ct. 252, 77 L.Ed. 439; Southern Railway-Carolina Division v. Bennett, 233 U.S. 80, 86, 87, 34 S.Ct. 566, 58 L.Ed. 860; City of Lincoln v. Power, 151 U.S. 436, 437, 438, 14 S.Ct. 387, 38 L.Ed. 224; New York, L. E. & W. R. Co. v. Winter, 143 U.S. 60, 75, 12 S.Ct. 356, 36 L.Ed. 71; and other cases.

In a few instances in the Circuits, ranging from Cobb v. Lepisto, 9 Cir., 1925, 6 F.2d 128, to Virginian Ry. Co. v. Armentrout, 4 Cir., 1948, 166 F.2d 400, 4 A.L.R.2d 1064, there has been a departure from the rule, to the extent of holding that an appellate court is entitled to review as a question of law whether the trial judge has abused his discretion in refusing to set aside a verdict for excessiveness or inadequacy. Dictum in two of our own cases can perhaps also be said to contain a suggestion of dilution. Thus in Louisville & N. R. Co. v. Botts, 8 Cir., 173 F.2d 164, 170, while we stated that "The amount of the verdict in a tort action is, of course, not reviewable by a federal appellate court," we added, "at any rate not except as a matter of correcting an absolutely plain injustice, in the interest of judicial administration itself." And in the most recent case, prior to the present one, involving the question, Chicago & N. W. Ry. Co. v. Curl, 8 Cir., 178 F.2d 497, 502, we said, after repeating the rule of our previous decisions, that "Assuming, as appellant contends, Virginian Ry. Co. v. Armentrout, 4 Cir., 166 F.2d 400, 407-409, 4 A.L.R.2d 1064, that this court may and should reverse a judgment in the exceptional case, 'where the verdict is so manifestly without support in the evidence that failure to set

it aside amounts to an abuse of discretion' on the part of the trial court, we are unable to find anything in this record to justify that action in this case."

In the case which last preceded the Curl case before us, New York, C. & St. L. R. Co. v. Affolder, 8 Cir., 174 F.2d 486, 493, we had again unequivocally declared that "The assignment of error that the verdict is excessive is not properly addressed to this court." The Supreme Court at the time of our Curl decision had taken the Affolder case on certiorari, but no decision had yet been rendered. In the opinion thereafter handed down by that Court, Affolder v. New York, Chicago & St. L. R. Co., 339 U.S. 96, 101, 70 S.Ct. 509, 511, 94 L.Ed. ——, the question of the excessiveness of the verdict was given consideration to the extent of saying, "We agree with the Court of Appeals that the amount of damages awarded by the District Court's judgment is not monstrous in the circumstances of this case." From this statement it would appear that the Court had undertaken to scrutinize the amount of the damages, and that it mistakenly assumed that we had done so also.

The opinion cites as supporting its test of "monstrous," Barry v. Edmunds, 116 U. S. 550, 6 S.Ct. 501, 29 L.Ed. 729, in which the expression appears as a quotation from Beardmore v. Carrington, K. B., 2 Wilson 244, 24 Eng.Rep. 790. But it should be noted that what was said in the Beardmore case was merely a statement of the standard for granting or denying a motion for a new trial. The same is true of the additional quotation set out in the Barry opinion from Whipple v. Cumberland Manufacturing Co., Fed.Cas.No.17,516, 2 Story 661, 670, where Mr. Justice Story, sitting on circuit as a trial judge and speaking of his responsibility as such in ruling on the motion for a new trial, said that a verdict in a tort case should not be set aside for excessive damages, "unless the verdict is so excessive or outrageous," in all the circumstances of the case, "as to demonstrate that the jury have acted against the rules of law, or have suffered their passions, their prejudices, or their perverse disregard of justice to mislead them."

We think it is to be kept in mind too that the Fairmount Glass Works case, the Southern Railway case, the City of Lincoln case, and the New York, L. E. & W. R. case, which have been referred to above and which categorically declare that it is not within the province of a federal appellate court, as the reviewer of error, to consider whether a verdict is excessive, are all subsequent to the Barry case.

It may be that a change in the rule is desirable, to allow a general review of the question of excessiveness, such as is the practice in many state appellate courts, or with a more restrained sense of responsibility, perhaps, to permit judgment to be passed upon whether there has been an abuse of discretion by the trial court in refusing to set aside a verdict on motion for new trial. Difficulties, however, would be involved in any such practice, as Judge Learned Hand has pointed out in the Miller case, supra, 2 Cir., 40 F.2d at page 465; and, under the concept of appellate function in jury cases which has heretofore been expressed by the decisions of the Supreme Court and in our own, the change is not one which we would feel entitled to make.

But if the Affolder opinion is to be taken as implying a change by the Supreme Court in the previously declared rule and a resulting duty on our part to test in any situation whether a verdict is "monstrous" or "outrageous," we believe that the perspective of that Court on the facts of the Affolder case would still not entitle us to set aside the judgment here as violative of that standard. In the Affolder case, where "The wheels of the car ran over (a switchman's) right leg and so mangled it that it was necessary to amputate it, leaving a stump only four inches in length," 8 Cir., 174 F.2d at page 488, the Supreme Court declared that $80,-000 damages was "not monstrous in the circumstances of this case."

In the present case, where there was a verdict for $150,000, the left leg had been cut off three inches below the hip joint, the right arm had been cut off three inches above the wrist, and only the thumb and forefinger remained upon the left hand. There was expert testimony that because of the shortness of the stump of the left leg

it could not satisfactorily be fitted with an artificial limb; that plaintiff further would not be able to use crutches as a means of locomotion, because of the condition of his hands; that he was therefore for all practical purposes a permanent wheel chair case; and that it would be necessary for him to have a constant attendant "to help him get around and help him with his clothing and to a certain extent to help him with his food."

These injuries and this disability, considered in connection with the deprivation of his previous earning power, the future expense confronting him, and the suffering and humiliation, etc., attending his condition, as well as the other elements of damages shown, would not enable us to say with any conviction that the recovery was "monstrous" or "outrageous" in the circumstances. Besides, while the verdict is large, we would not have the right to shut our eyes wholly to the fact that it is not out of line with what juries more and more generally have been doing under present economic conditions. See tabulation of "Verdicts or Awards Exceeding $50,000," in 4 NACCA Law Journal 280-310.

We do not feel that there is anything in the proceedings which entitles us to reverse, and the judgment therefore is affirmed.